**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAROL GOREY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -against- | ) |
| | )  Case No.: 10-cv-01132 (JSG) (LMS) |
| MANHEIM SERVICES CORPORATION | ) |
| d/b/a MANHEIM NEW YORK and d/b/a | ) |
| NEWBURGH AUTO AUCTION, | ) |
| MANHEIM, COX ENTERPRISES, INC., | ) |
| MANHEIM AUTOMOTIVE DEALER | ) |
| SERVICES, INC., MANHEIM'S | ) |
| REMARKETING SOLUTIONS, and | ) |
| MANHEIM REMARKETING, INC., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## <u>DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED FACTS</u>
## <u>IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>

In support of their Motion for Summary Judgment, Defendants Manheim Remarketing,

Inc. d/b/a Manheim New York, Manheim Services Corporation, Manheim, Inc., Cox Enterprises,

Inc., Manheim Automotive Dealer Services, Inc., and Manheim's Remarketing Solutions

(collectively, "Defendants"), pursuant to Fed.R.Civ.P. 56 and Local Rule 56.1, hereby submit the

following statement of material facts to which there is no genuine dispute.  The Defendants

concede the truth of the following facts solely for purposes of their motion for summary

judgment.  All exhibits are appended to the Declaration of Lesli Gaither, filed concurrently

herewith.  All declarations referenced are filed concurrently herewith.

## <u>TABLE OF CONTENTS</u>

I.    Statement of the Case……………………………………………………………...1

II.   Parties…………………………………………………………………………...2

III.  Manheim New York's Business…………………………………………….......5

IV.   Outside Dealer Sales Representatives……………………………………………11

      A.    OSR Compensation.......................................................................................15

      B.    OSR Training………………………………………………………………17

      C.    OSR  Job  Duties………………………………………………………..19

## I.      Statement of the Case.

1.      Plaintiff Carol Gorey ("Plaintiff" or "Gorey") has sued on behalf of herself and others similarly situated, claiming unpaid overtime and minimum wage violations under the Fair Labor Standards Act and New York State Labor Law and also unpaid spread of hours premiums under the latter.  Third Amended Complaint (Dkt# 42) ("TAC") at ¶¶ 46-58.

2.      Defendants have answered and affirmatively denied that Plaintiff was entitled to such payments because she was an outside sales employee and/or an administrative employee exempted from such payments under the relevant law.  Answer and Affirmative Defenses (Dkt# 46) at Fifth Defense, Sixth Defense.

3.      The Defendants, other than Manheim Remarketing, Inc. d/b/a Manheim New York f/k/a Newburgh Auto Auction, have also answered and affirmatively defended that they were not Plaintiff's employer.  Id. at Third Defense.

4.      For purposes of Gorey's FLSA claim, the Court has conditionally certified a collective action of all dealer sales representatives or outside sales representatives at each domestic Manheim auction who, at any time on or after October 22, 2007, (1) were classified as "exempt" under the FLSA, (2) worked more than forty hours in a week, and (3) were not paid overtime.  Conditional Certification Opinion & Order ("Conditional Cert. Order") (Dkt# 37) at 10.  The Court specifically excluded employees of Cox Enterprises, Inc. and its other non-Manheim subsidiaries from the conditional group.   Id. at 8.

5.      Of 638 potential class members sent the Notice of FLSA Collective Action Lawsuit, only 55 opted in, and ten (10) of those, including the only two active employees, are now subject to a motion to dismiss for failure to participate in discovery.  Declaration of Lesli

Gaither ("Gaither Decl.") at ¶ 5; Consents to Opt-In (Dkt## 48-75, 79-89, 91-106); Motion to Dismiss for Lack of Prosecution (Dkt## 122-124).

## II.    Parties.

6.    Plaintiff Carol Gorey was a "Dealer Sales Representative" and "Outside Sales Representative" (hereinafter, "OSR") at Manheim New York.  TAC at ¶ 26; Declaration of Carol Gorey (Dkt. 24) ("First Gorey Decl.")[1] at ¶ 1; 03/03/11 Deposition of Carol Gorey ("Gorey Depo.") at 83-84 (Gaither Decl. Ex. B); id. at Ex. 9 (Gaither Decl. Ex. H).[2]

7.    When Plaintiff voluntarily resigned from Manheim New York in March 2009, she wrote a letter to management saying her time at the auction had been "wonderful."  Gorey Depo. at 43:19-44:21 (Gaither Decl. Ex. B); id. at Ex. 6 (Gaither Decl. Ex. F); but see id. at 44:22-45:9 (Gaither Decl. Ex. B) (claiming that the statement was not true when made but Plaintiff was willing to lie about it to get another position with a different Manheim-affiliated auction or Cox).

8.    The Opt-In Plaintiffs are 55 OSRs from Manheim New York and other Manheim-branded auctions across the country.[3]  See Gaither Decl. at ¶ 3.  With two exceptions subject to a discovery-related motion to dismiss, all the Opt-Ins are former employees of a Manheim location, i.e., none of them remain successfully in the positions at issue.  Id. at 5; Motion to Dismiss (Dkt## 122-124) (moving to exclude, inter alia, active employees Michelle Guerrin and Jeremy Selecky for refusing to participate in discovery).

---

[1]  Plaintiff also confirmed both her declarations as true in her deposition.  Gorey Depo 9:5 – 12:7 (Gaither Decl. Ex. B); id. at Ex. 1 & 2 (Gaither Decl. Exs. C-D).

[2]   Records cited herein are attached to the accompanying Declaration of Lesli Gaither, identified herein as "Gaither Decl."

[3]   The Opt-In Plaintiffs are all employees of d/b/a's of Manheim Remarketing, Inc. or Manheim Investments, Inc.  Gaither Decl. at ¶ 3.

9.      Only 32 of the 55 Opt-Ins have been employed as an OSR at any point in time since October 22, 2008.  The Opt-In Plaintiffs who were not employed in a relevant position after October 22, 2008 include Joseph Algood, Tracey Bird, Robert Clarke, William Clayton, Lee Copeland, Mark Crilley, Jeff Cross, Edward Delucia, Robert Endter, Karl Hawk, Jeffrey Haight, Linda Henry, Mike Herbst, Charles Krasucki, Tammy Lawson, Daniel Louie, Petra Price, Betzaida Ruiz, Raul Samaniego, Greg Scipes, Chauncy Sirles, Dan Thompson, and Fred Williams.  Gaither Decl. at ¶  4.

10.     Plaintiff has testified that all other OSRs in the putative class, including the Opt-In Plaintiffs, had substantially the same job duties and responsibilities as her and are similarly situated.  Gorey Decl. (Dkt. 24) ¶ 9; Gorey Depo. at 81:16-82:16 (Gaither Decl. Ex. B).  Counsel for all Plaintiffs has alleged the same.  TAC ¶¶  27-29; Memorandum in Support of Motion for Certification (Dkt# 22) at 4-5.[4]

11.     During the relevant time period, Plaintiff Gorey's employer was Manheim Services Corporation d/b/a Manheim New York f/k/a Newburgh Auto Auction.  Deposition of Gary Charlesworth ("Charlesworth Depo.") at 66:6-19 (Gaither Decl. Ex. OO); Gorey Depo. at 37:10-12 (Gaither Decl. Ex. B).  In or around December 2009, Manheim Services Corporation was merged into Manheim Remarketing, Inc., and Manheim New York is now an assumed trade name of Manheim Remarketing, Inc.  Declaration of Gary Charlesworth ("Charlesworth Decl.") at ¶ 21.

12.     Manheim, Inc. is an indirect parent corporation of Manheim Remarketing, Inc.  It is separately incorporated in Delaware, and not registered to do business in New York.  Gaither

---

[4] Defendants do not concede Plaintiff's testimony is accurate in this regard but assume it to be true for purposes of this motion for summary judgment only.

Decl. at ¶ 48 and Exs. RR-SS.  Manheim, Inc. does not control the day-to-day operations of

Manheim New York.  Charlesworth Depo. at 38:13-18 (Gaither Decl. Ex. OO); Charlesworth

Decl. at ¶ 18; <u>see also</u> Declaration of Art Soudek ("Soudek Decl.") at ¶ 4 (same as to Manheim

Chicago).

  13. Cox Enterprises, Inc. is an indirect parent company of Manheim Remarketing,

Inc.  It is separately incorporated in Delaware and not registered to do business in New York.

Gaither Decl. at ¶ 49 and Exs. TT-UU.  Cox Enterprises, Inc. does not control the day-to-day

operations of Manheim New York.  Charlesworth Depo. at 38:13-18 (Gaither Decl. Ex. OO);

Charlesworth Decl. at ¶ 19; <u>see also</u> Soudek Decl. at ¶ 4 (same as to Manheim Chicago).

  14. Manheim Automotive Dealer Services, Inc. is a separately-incorporated affiliate

of Manheim Remarketing, Inc.  Gaither Decl. at ¶ 50 and Ex. VV.  Manheim Automotive Dealer

Services, Inc. does not control the day-to-day operations of Manheim New York.  Charlesworth

Depo. at 38:13-18 (Gaither Decl. Ex. OO); Gorey Depo. at 282:7-25 (Gaither Decl. Ex. B);

Charlesworth Decl. at ¶ 20; <u>see also</u> Soudek Decl. at ¶ 4 (same as to Manheim Chicago).

  15. Manheim's Remarketing Solutions was a separate entity formerly authorized to

do business in New York that was sold by Manheim, Inc. in 2009.  Deposition of Nick Peluso

("Peluso Depo.") at 165:20-25 (Gaither Decl. Ex. PP).  Manheim's Remarketing Solutions does

not control the day-to-day operations of Manheim New York.  Charlesworth Decl. at ¶ 21;

Charlesworth Depo. at 38:13-18 (Gaither Decl. Ex. OO); Gorey Depo. at 280:33-282:25 (Gaither

Decl. Ex. B) (Plaintiff Gorey did not report to anyone at Manheim's Remarketing Solutions); <u>see</u>

<u>also</u> Soudek Decl. at ¶ 4 (same as to Manheim Chicago).

16.     No one at Manheim, Inc., Cox Enterprises, Inc., Manheim Automotive Dealer
Services, Inc., or Manheim's Remarketing Solutions is involved in the hiring or firing of OSRs at
Manheim New York or the other Manheim-affiliated auctions, nor do they dictate the salary,
commission plan, job responsibilities, work schedule, or conditions of employment for any of the
OSRs.  Peluso Depo. at 37:3-6, 48:5-49:10, 55:21-56:3 (Gaither Decl. Ex. PP); Charlesworth
Decl. at ¶ 22; Deposition of Gordon French ("French Depo.") at 154:9-16 (Gaither Decl. Ex.
QQ); Soudek Decl. at ¶ 4 (same as to Manheim Chicago).

### III.  Manheim New York's Business.

17.     Manheim New York is principally in the business of providing wholesale
automobile auctions for licensed car dealers, banks, fleet companies, manufacturers, and related
businesses to buy and sell cars and other motor vehicles on a wholesale basis.  Conditional Cert
Order at 2; Gorey Depo. at 48:11-48:18 (Gaither Decl. Ex. B); Charlesworth Depo. at 207:17-20
(Gaither Decl. Ex. OO); Declaration of Donald McKenna ("McKenna Decl.") at ¶ 2.

18.     Manheim New York serves as auctioneer in those transactions, also guaranteeing
titles to paying buyers and guaranteeing payments to selling dealers.  Gorey Depo. at 53:12-
54:17 (Gaither Decl. Ex. B) (describing auction sale process); id. at Ex. 7 (Gaither Decl. Ex. G)
(auction invoices spelling out duties of three parties to contract); id. at 59:8-59:20 (Gaither Decl.
Ex. B) (discussing transfer of title from seller to buyer); Charlesworth Depo. at 100:11-16
(Gaither Decl. Ex. OO).

19.     The auction typically earns a buyer fee and a seller fee on units successfully
auctioned, and a "no sale" fee from the consignor on units that run across the auction block but
do not sell.  Gorey Depo. at 48:19-48:23 (Gaither Decl. Ex. B) (discussing buyer and seller fees);
id. at 59:21-60:24 (Gaither Decl. Ex. B) (same); id. at 63:3-63:18 (Gaither Decl. Ex. B)

(discussing "no sale" fee); Charlesworth Depo. at 90:3-7, 92:5-8 (Gaither Decl. Ex. OO)

(discussing various auction fees).

     20.     When cars are sold at Manheim New York, the parties to the deal sign a three-

way contract, among the buyer, the seller, and the auction, known as an "invoice" or "bill of

sale."  Gorey Depo. at 54:15-59:7 (Gaither Decl. Ex. B); id. at Ex. 7 (Gaither Decl. Ex. G)  (four

examples of auction sales invoices involving dealers in Gorey's territory); id. at Exs. 34 (Bates

nos. MAN-NY 02342-02343) & 35 (Bates nos. P4128, P4108, P4114) (Gaither Decl. Exs.T-U)

(showing Gorey earned commissions on the sale of those same four units, among many others).

     21.     Manheim New York also provides a number of other services to its customers for

various fees, including transportation, reconditioning, repair, inspection, financing services, key

replacement, etc.  Conditional Cert Order at 2; Gorey Depo. at 61:13-66:11 (Gaither Decl. Ex. B)

(discussing the various services and fees offered by the auction); id. at Ex. 13 (Gaither Decl. Ex.

I) (list of fees and services); Charlesworth Decl. at ¶ 5; McKenna Decl. at ¶ 6. (discussing

services offered by Manheim New York).

     22.     While there is a standard fee for many of the services, Manheim New York will

often negotiate a fee schedule for its various services with dealer customers that varies from its

standard fee schedule.  Charlesworth Depo. at 94:6-8 (Gaither Decl. Ex. OO) (dealer sales

representatives are "free to negotiate that [fee schedule] with the customer face-to face"); Gorey

Depo. at 61:13-62:14 (Gaither Decl. Ex. B) (describing the fee schedule as an "agreement" with

the seller regarding fees); id. at 63:9-63:18 (Gaither Decl. Ex. B) (dealers negotiate out of "no

sale" fees, for example, on "A/R exceptions list"); id. at Ex. 13 (Gaither Decl. Ex. I) (examples

of dealer "A/R Exceptions" list for Gorey's dealers); McKenna Decl. at ¶¶ 7 -10 (discussing

negotiation of fees and memorialization of fee schedules at Manheim New York); Declaration

of Gary Lawrence Haeger ("Haeger Decl.") at ¶¶ 7-11 (same at Manheim Chicago/ Manheim

Metro Chicago); Declaration of Julie Cristina Maddox ("Maddox Decl.") at ¶ 9  (same at

Manheim Atlanta); Declaration of Robert Leonard Delano ("Delano Decl.") at ¶¶ 9-10 (same at

Manheim Chicago/ Manheim Metro Chicago); Declaration of Harry William Kent ("Kent

Decl.") at ¶¶ 7-11 (same at Manheim Georgia).

      23.    The auction's customers routinely negotiate those fees and services through

OSRs, such as Plaintiffs.  Gorey Depo. at 61:13-15; 114:21-117:5, 127:12-20; 128:4-9 (Gaither

Decl. Ex. B); id. at Ex. 13 (Gaither Decl. Ex. I) (showing fee schedules for dealers in Gorey's

territory with her name as "contact" on them); id. at Ex. 16-18 (Gaither Decl. Exs. J-L) (showing

emails from Gorey regarding dealer fee schedules); McKenna Decl. at ¶¶ 7 -10 (generally

discussing negotiation of fees); id. at ¶ 8 ("I can and do negotiate terms with dealer prospects on

… fees.  I can always agree to [Manheim New York's] standard fees."); id. at ¶ 10 ("I routinely

do answer to dealers and help get it sorted out if they are charged more than the agreed upon

fees."); Deposition of Mikel Herbst ("Herbst Depo.") at 59:17-60:9 (Gaither Decl. Ex. CC);

Haeger Decl. at ¶¶ 7-9, 11 ("I negotiated terms of rebate plans with dealer prospects," "I

negotiated the waiver of buy back fees and rebates for buy back fees with dealers."); id. at ¶ 9

("The dealer would contact me if there were any questions with regards to the rebates, if they

were actually charged differently than discussed, or if they wanted to renegotiate the rebate

plan."); Maddox Decl. at ¶ 9  (same at Manheim Atlanta); Kent Decl. at ¶¶ 8-9 (same at

Manheim Georgia: negotiated fee concessions and "also negotiated rebates for their

transportation fees."); id. at ¶ 9 ("Dealers would contact me if there were any questions with

regards to fees, if they were actually charged differently than discussed, or if they wanted to

renegotiate the fee structure."); Delano Decl. at ¶¶ 9-10 ("If a dealer was charged more than the

agreed upon fees or the dealer wanted to re-negotiate the fees, they would come to me to discuss. I was the first point of contact for the dealer because I negotiated the fees directly with the dealer."); Pendley Personal Goals/Territory Goals & Seminars (Gaither Decl. Ex. LL) at ¶ 2 ("In order to obtain my goals I feel I need to get in front of dealers with figures I can offer them to entice them to start, continue, and increase units with [Manheim Cincinnati]"); Charlesworth Depo. at 89:14-90:1, 92:10-93:12 (Gaither Decl. Ex. OO).

24.     The negotiated fees often vary by dealer.  Gorey Dep. at 125:3-5 (Gaither Decl. Ex. B); McKenna Decl. at ¶ 9.

25.     Usually that negotiated fee schedule is reduced to writing, <u>see, e.g.,</u> Gorey Depo. at Ex. 13 (Gaither Decl. Ex. I), and it becomes the binding rate schedule for that dealer once agreed.   Gorey Depo. at 63:15-63:18 (Gaither Decl. Ex. B); Gorey Depo. at 118:2-22 (Gaither Decl. Ex. B) (when a dealer questioned a fee change, Gorey would intercede with management to remind them "what was agreed upon," which was "written up at the auction"); Charlesworth Depo. at 89:14-94:9, 96:20-97:9 (Gaither Decl. Ex. OO); McKenna Decl. at ¶ 10 ("Once I have come to terms with the dealer on a fee schedule, it is generally memorialized in an 'A/R Exception List' or some equivalent document … both parties understand it to be the binding fee schedule for any covered services used by the dealer until the deal is renegotiated."); Haeger Decl. at ¶¶ 9, 11 (discussing memorialization of fees); <u>id.</u> at 11 ("Once I agreed to terms with the dealer on a waiver of buy back fees, the deal was generally memorialized in a 'rebate form' or some equivalent document."); Maddox Decl. at ¶ 9 ("Once I had agreed a fee schedule with a dealer it would be reflected in the 'master list.' "); Delano Decl. at ¶ 10 ("Once I came to terms with the dealer on a fee schedule, it was generally memorialized in a document.").

26.     Occasionally, the agreement will be signed by the dealer while the OSR is at the dealership.  Charlesworth Depo. at 97:2-9, 107:15-108:1 (Gaither Decl. Ex. OO); Kent Decl. at ¶ 9 ("Generally, once the fee structure had been negotiated, I presented a document containing the fee structure to the dealer.  Sometimes the dealer would sign the fee structure, but otherwise the dealer would verbally acknowledge that the document contained the terms of the deal as agreed.").

27.     Manheim New York is willing to negotiate such fees in order to better their competitors and win more business from the dealer.  Charlesworth Depo. at 91:4-10, 92:20-93:12 (Gaither Decl. Ex. OO) (discussing effect of competition on negotiating fees); Gorey Depo. at 122:15-22 (Gaither Decl. Ex. B) (noting example of where dealer "must maintain 50 percent sold units" to keep the fee deal); McKenna Decl. at ¶ 9 ("[M]any fee concessions given to dealers are dependent on their maintaining a certain consignment level and/or sales percentage."); Haeger Decl. at ¶ 10 ("[M]any rebates and other dealer concessions we negotiated [at Manheim Chicago/ Manheim Metro Chicago] were dependent on the dealer maintaining a certain consignment level and/or sales percentage, which gave the dealer an incentive to use [Manheim Chicago/ Manheim Metro Chicago's] services heavily."); Delano Decl. at ¶ 15 (same); Kent Decl. at ¶ 10 (same).

28.     Given the various services offered by Manheim New York for a fee and its standard "no sale" fee, it is very rare that a vehicle gets consigned to Manheim New York without the auction earning some money on the unit.  Charlesworth Depo. at 109:16-110:5 (Gaither Decl. Ex. OO); McKenna Decl. at ¶ 6 (discussing services offered by Manheim New York: Manheim New York "earns a fee for most of those services.").cf. Gorey Depo. at 66:7-66:11 (Gaither Decl. Ex. B) (once a dealer commits to send a car to the auction, there are several different ways the auction can make money on that unit).

29.     Most auction customers, especially those whose business is most valuable to the auction and its commissioned representatives, deal in multiple vehicles on a given auction sale day and come back more than once.  Charlesworth Decl. at ¶ 7; Gorey Depo. at 68:21-25 (Gaither Decl. Ex. B) (some dealers deal in a lot of cars on a given day and some deal in a few cars);McKenna Decl. at ¶ 18 ("Most of my dealers buy and sell multiple cars in a given trip to [Manheim new York], and most of those cars are worth several thousand to tens of thousands of dollars each."); Maddox Decl. at ¶ 19 ("The majority of my dealers bought and sold multiple cars in a given trip to [Manheim Atlanta][.]"); Haeger Decl. at ¶ 15 ("Most of my dealers would buy or sell multiple vehicles at a given [Manheim Chicago/Manheim Metro Chicago] sale[.]"); Delano Decl. at ¶ 21 ("The majority of my dealers bought and sold multiple cars in a given trip to [Manheim Chicago/Manheim Metro Chicago], and most of those cars were worth thousands of dollars each."); Kent Decl. at ¶ 15 (same at Manheim Georgia).

30.     Thus, winning a new dealer's business can lead to many sales and many commission payments for the OSR.  Gorey Depo. at Ex. 37 (Gaither Decl. Ex. W) (showing commissions for dealers in the first 30 days of new business alone totaling, among other amounts: (1) $700 for March 2008; (2) $520 for April 2008; (3) $580 for June 2008; (4) $1320 for August 2008; (5) $660 for October 2008; and (6) $1020 for November 2008); McKenna Decl. at ¶ 18 ("Most of my dealers buy and sell multiple cars in a given trip to [Manheim New York] . . . [E]ach auction sale is significant in dollar amount, and keeping it together is important to the dealer, [Manheim New York], and to me, in terms of commissions and getting further volume from that dealer.").

31.     Vehicles consigned to and sold at Manheim New York are usually worth thousands or tens of thousands of dollars, so their proper sale and handling is a matter of

significance for the auction and the dealers involved.  Charlesworth Decl. at ¶ 7; McKenna Decl. at 18; Haeger Decl. at ¶ 15 ("Most of my dealers would buy or sell multiple vehicles at a given [Manheim Chicago or Manheim Metro Chicago] sale, and some of those interactions with the dealer would involve tens of thousands of dollars worth of vehicles."); Maddox Decl. at ¶ 19 ("The majority of my dealers bought and sold multiple cars in a given trip to [Manheim Atlanta], and most of those cars were worth thousands to tens of thousands of dollars each.  So each transaction was significant in dollar amount, and keeping the sale together was important to the dealer, the [Manheim Atlanta], and to me, in terms of commissions and getting further business from that dealer."); Delano Decl. at ¶ 21 (same at Manheim Chicago and Manheim Metro Chicago); Kent Decl. at ¶ 15 ("Most of my dealers would buy or sell multiple vehicles at a given [Manheim Georgia  sale, so each of those interactions with the dealer would involve tens of thousands of dollars worth of vehicles.  Dealers were typically very serious about having their cars handled properly and getting the best possible prices for them, as was [Manheim Georgia].")

32.     Plaintiff Gorey has testified that the other Manheim auctions generally operate in the same way as Manheim New York.  Gorey Depo. at 67:13-68:9 (Gaither Decl. Ex. B); see also Herbst Depo. at 63:24:64:9 (Gaither Decl. Ex. CC); Conditional Cert Order at 2 ("Manheim . . . operates more than seventy similar automobile auctions across the country.").

**IV.     Outside Dealer Sales Representatives.**

33.     Manheim New York makes its own decisions as to whether, and to what extent, to employ OSRs, as well as inside dealer sales representatives.  Manheim New York is responsible for their hiring and firing, setting the scope of their duties, their salary and pay structure, and all other aspects of their employment, and does not generally consult with the other defendants in

doing so.  Charlesworth Decl. at ¶ 9; see also Soudek Decl. at ¶¶ 4-5 (same at Manheim Chicago).

34.    Manheim New York currently employs both OSRs and inside dealer sales representatives.  Charlesworth Decl. at ¶ 10.  When a sales representative is hired, the human resources department at Manheim New York examines their specific job duties to determine whether they will be classified as "exempt" or "non-exempt" from overtime requirements.  Charlesworth Depo. at 70:3-8 (Gaither Decl. Ex. OO).

35.    Inside sales representatives work at the auction premises most days, helping dealer customers with any problems and soliciting business for the auction by phone.  They are classified as "non-exempt" and paid overtime.  Conditional Cert Order (Dkt. #37) at 2-3; Charlesworth Decl. at ¶ 10; Herbst Depo at 95:15-96:13 (Gaither Decl. Ex. CC) (inside dealer sales representatives entered customer data, which freed up the outside dealer sales representatives' time to visit dealers); McKenna Decl. at ¶ 19 (Manheim New York "has 'inside sales representatives' that do most of our purely phone sales and take over any routine, clerical work that must be done … That allows me and the other outside sales representatives to focus on dealer visits and new business."); Haeger Decl. at ¶ 19 (discussing assistance provided by inside sales representatives); Maddox Decl. at ¶ 22 (discussing assistance provided by inside sales representatives: "When I was on the road, I could call an inside dealer representative to send me documents or information that I needed, which allowed me to focus on dealer visits and bringing new business to [Manheim Atlanta]."); Delano Decl. at ¶ 23 (same at Manheim Chicago and Manheim Metro Chicago); Kent Decl. at ¶ 18 (same at Manheim Georgia).

36. Plaintiff Gorey was an OSR at Manheim New York.[5] Gorey Depo. at 37:5-12 (Gaither Decl. Ex. B). Plaintiff's "[p]rimary job duties remained the same" "[d]uring the course of [her] employment with Manheim." Gorey Decl. (Dkt. 24) ¶ 9. Again, she has testified that her duties were the same as other OSRs at Manheim New York and at other Manheim auctions. Facts 10 & 32, supra.

37. OSRs at Manheim New York are classified as "exempt" from overtime based on a good faith determination by its management that they are outside salespersons generally operating outside the auction's direct supervision and, if not, they are at least exempt administrative employees. Charlesworth Decl. at ¶ 11; Charlesworth Depo. at 85:17-22 (Gaither Decl. Ex. OO). Outside the present lawsuit, no OSR at Manheim New York has ever complained to management about his or her status as an "exempt" employee or about the fact that they did not receive overtime, and the "exempt" classification has gone without regulatory challenge. Charlesworth Depo. at 82:2-7, 83:14-17 (Gaither Decl. Ex. OO); Charlesworth Decl. at 11; Soudek Decl. at ¶ 6 (same at Manheim Chicago).

38. OSRs generally think of themselves as salespersons and prefer a salary and commission in lieu of over time and minimum wage. Herbst Depo. at 42:20-42:24 (Gaither Decl. Ex. CC) (confirming that the sales aspect of the OSR position appealed to him); McKenna Decl. at ¶ 25 ("I understand myself to be a professional salesperson, paid by salary and commission that awards my extra efforts."); id. at ¶ 22 ("I believe my work is important and impacts matters of significance to those involved, namely the dealer customers, [Manheim New York], and me. I believe my work is closer in significance to that of a manager, than a clerk.");

---

[5] While employed as an OSR at Manheim New York, Plaintiff represented herself to the federal government on her tax returns as a "manager." Gaither Decl. at Ex. AA (attaching Plaintiff's tax returns for 2006 – 2009).

Haeger Decl. at ¶ 23 ("While an OSR, I understood myself to be a professional salesperson, paid by salary and commission that rewarded by extra efforts, and preferred that to having my hours carefully tracked, monitored, and limited, like an ordinary clerk or inside sales representative."); Kent Decl. at ¶ 22 (same); Maddox Decl. at ¶ 27 (same); id. at ¶ 25 ("My work was important and impacted matters of significance to those involved, namely the dealer customers, [Manheim Atlanta], and me.  I believe my work was closer in significance to that of a manager, than a clerk because I set my own schedule, my hours were flexible, the work was critical to [Manheim Atlanta], and there was very little supervision over the method and manner of my work."); Delano Decl. at ¶ 29 ("I understood myself to be a professional salesperson, paid by salary and commission that rewarded extra effort, and I preferred that to being paid by the hour.").

39.     Before coming to Manheim, OSR's professional backgrounds are often in sales. Gorey Depo. at 15:20-16:7 (Gaither Decl. Ex. B) (worked in real estate sales for a significant period of time just before Manheim); id. at 14:21-15:19, 16:21-17:25 (Gaither Decl. Ex. B)  (had received specialized training in real estate "sales"); id. at 20:18-21:13 (Gaither Decl. Ex. B) (worked in Tupperware sales before going into real estate sales, which involved going into people's homes, selling products, and earning a commission) id. at 19:17-20:17, 25:15-26:23 (Gaither Decl. Ex. B) (confirming resumes at Ex. 3 as representative of her experience); Herbst Depo. at Ex. 44 (Gaither Decl. Ex. DD) (employment application to Manheim); id. at 13:4-18:8 (Gaither Decl. Ex. CC) (summarizing prior experience in sales of photocopiers, cars, collection services, and painting services with various employers); McKenna Decl. at ¶ 24 (discussing sales experience acquired prior to joining Manheim New York); see also Haeger Decl. at ¶ 22 (discussing prior experience as sales person in car dealership); Kent Decl. at ¶ 21 (nineteen years at motor vehicle dealerships selling and buying cars prior to joining Manheim Georgia); Resume

14

of D. Delucia (Gaither Decl. Ex. II) (worked as: a "Pre-Owned Vehicle Sales Manager" at

Findlay Ford Lincoln Mercury, "New Vehicle Sales Manager and Business Manager" at Floyd

Enterprises, Inc., "New Vehicle Sales Manager" at Vin Devers, Inc.; lists training prior to joining

Manheim as: "Chrysler Corporation Customer-One Training, and several other Sales

Management Seminars," and "Ford Motor Company Sales Manager School"); J. Pendley

Resume (Gaither Decl. Ex. KK) (summarizing sales experience).

40.     Indeed, when hiring an OSR, Manheim New York looks for experienced sales

people or persons with "sales-type personality and abilities."  Charlesworth Depo. at 147:1-13

(Gaither Decl. Ex. OO); Delano Decl. at ¶ 5 ("When I was hired for the [Outside Dealer Sales

Representative] position, I was explicitly told that I was being hired for a sales position and my

success depended on sales.").

41.     After leaving their positions, OSRs have often continued to work in sales-related

positions.  See, e.g., Gorey Depo. at 22:13-23:22 (Gaither Decl. Ex. B) (confirming work as a

sales representative for dealers, including Country Lincoln Mercury West); id. at 79:13-80:2

(Gaither Decl. Ex. B) (the Country Group was one of the dealers in Gorey's assigned territory,

and she ended up working for their Country Lincoln Mercury West store upon leaving the

auction); Herbst Depo. at 22:16-25:23 (Gaither Decl. Ex. CC) (currently working in vehicle sales

for Desert Truck, a dealer in his sales territory while at Manheim); id. at 34:13 (Gaither Decl. Ex.

CC) (confirming title in his current position is "Sales Manager").

   **A.     OSR Compensation.**

42.     OSRs at Manheim New York receive a salary in excess of $455 per week and

$2340 per month, and Plaintiff Gorey earned in excess of $543.75 per week.  Charlesworth Decl.

at ¶16; Gorey Depo. at 214:8-21 (Gaither Decl. Ex. B);Gorey Depo. at Ex. 40 (Gaither Decl. Ex.

Z); McKenna Decl. at ¶15 ("I earn a salary of more than $455/week."); Soudek Decl. at ¶ 14 (same at Manheim Chicago).

43.     In addition, OSRs receive a substantial portion of their total compensation in the form of sales commissions tied to vehicle sales at auction by dealer customers in their territory. Gorey Decl. (Dkt. 33) at ¶ 11 & Ex. E (showing $20,680 in commissions, or 24.56% of total pay for 2008 YTD); Gorey Depo. at 14:4-14:7 (Gaither Decl. Ex. B)  and Exs. 31-39 (Gaither Decl. Exs. Q-Z); id. at 106:20-107:21 (Gaither Decl. Ex. B) (giving examples of dealers in her territory that she was paid commissions for after she got them to "start running cars" at the auction); Charlesworth Depo. at 122:13-14 (Gaither Decl. Ex. OO); McKenna Decl. at ¶15 ("[S]ubstantial part of my compensation from Manheim New York in the form of sales commissions."); Herbst Depo. at 32:10-13, 52:5-8 (Gaither Decl. Ex. CC); Haeger Decl. at ¶ 17 (same at Manheim Chicago and Manheim Metro Chicago: "While I was an OSR, I earned a base salary … but I also received substantial additional compensation in the form of sales commissions.  In some years the commissions I earned were greater than my base salary."); Maddox Decl. at ¶ 16 (same at Manheim Atlanta: "While I was an OSR, I earned a base salary, but I also received substantial additional compensation from [Manheim Atlanta] in the form of sales commissions."); Delano Decl. at ¶ 17 (same at Manheim Chicago and Manheim Metro Chicago); Kent Decl. at ¶ 16 (same at Manheim Georgia: "earned a base salary of more than $455 per week, and I also received substantial additional compensation in the form of sales commissions."); see also Fact 30, supra.

44.     Although it has changed over time, the commission plan for OSRs at Manheim New York is set up to decline, with respect to a given dealer, over a 90-day period, so as to give the OSR an incentive to generate new sales by new dealers.  Charlesworth Depo. at 133:11-134:9

(Gaither Decl. Ex. OO); McKenna Decl. at ¶15; Gorey Depo. at 106:13-106:15 (Gaither Decl. Ex. B) ("Commissions on new accounts only lasted for 90 days."); id. at Exs. 35-37 (Gaither Decl. Exs. U-W) (describing and calculating commissions under such a plan in 2008); id. at Ex. 39 (Gaither Decl. Ex. Y) (describing the plan for 2009).

45.    In addition, Manheim New York would often set temporary commission plans for OSRs to incentivize them to sell new auction services to a dealer. In those instances, the bonus would trigger on the sell of the service. Charlesworth Depo. at 122:20-123:3 (Gaither Decl. Ex. OO); see also Soudek Decl. at ¶ 14 ("OSRs [at Manheim Chicago] also earned commissions on cars sold by their dealers as well as on certain other services sold that the auction would emphasize from time-to-time (e.g. post-sale inspections)."); see also Maddox Decl. at ¶ 5 (discussing compensation based on auction services).

**B.    OSR Training.**

46.    OSRs receive frequent formal sales training that focuses on (i) "improving [their] dealer sales percentage," Gorey Depo. at 151:12-159:8 (Gaither Decl. Ex. B); id. at Exs. 19, 20, 21 (Gaither Decl. Exs. M-O); Gorey Decl. (Dkt. 33) at Ex. I; (ii) the consultative nature of the dealer sales representative position, Gorey Depo. at Ex. 19, pp. 64 (bates stamped MAN-NY 02732) (Gaither Decl. Ex. M); and (iii) "what to talk to dealers about when you go on the road," Gorey Depo. at 151:2-151:11(Gaither Decl. Ex. B). See also Gorey Decl. (Dkt. 24) at ¶ 10 ("at least two times per year," "also regularly attended smaller meetings with [reps] from the region"); Gorey Decl. (Dkt. 33) at ¶ 8; Gorey Depo. at 112:8-18 (Gaither Decl. Ex. B) (testifying that she would use her sales training to assist in speaking with dealers); Herbst Depo. at 53:7-53:10 (Gaither Decl. Ex. CC); id. at Ex 45 (Gaither Decl. Ex. EE); McKenna Decl. at ¶ 23 ("I am informed by formal sales training received from Manheim New York. Manheim sales training

emphasizes making a connection with the dealer and increasing my sales percentage with each dealer."); Haeger Decl. at ¶ 22 ("training emphasized making a connection with the dealer and increasing my sales percentage with the dealer"); Delano Decl. at ¶ 27 (same: "provided me with the tools that I needed to sell the [Manheim Chicago and Manheim Metro Chicago's] services and facilities to the dealers in my territory."); Kent Decl. at ¶ 21 (same); Maddox Decl. at ¶ 26 ("The training provided by the [Manheim Atlanta] emphasized making a connection with the dealer, growing my territory, and increasing my sales percentage with each dealer and provided me with the tools that I needed to sell the [Manheim Atlanta's] services and facilities to the dealers in my territory.").

47.     OSRs are trained on a sales cycle of:  "(1) setting the appointment, (2) building knowledge and credibility; (3) establishing a pattern of helping; and (4) negotiating interests and goals."  Gorey Depo. at Ex. 19 (Gaither Decl. Ex. M); id. at 154:3-15 (Gaither Decl. Ex. B) (confirming attendance at training).

48.     OSRs are also specifically trained to be consultative and understand the dealer's business, including to "[a]nticipate their needs," "coordinate services tailored to their needs," and "deliver value, price, and quality of services."  Gorey Depo. Ex. 19 (Gaither Decl. Ex. M); id. at 154:3-15(Gaither Decl. Ex. B) (confirming attendance at training).

49.     OSRs also engaged in role play training where one representative pretends to be a dealer.  Gorey Decl. (Dkt. 33) at ¶ 19.

50.     While an OSR, Plaintiff Gorey also read sales publications provided by management at Manheim New York, Gorey Depo. at 160:3-161-22 (Gaither Decl. Ex. B); id. at Ex. 22 (Gaither Decl. Ex. P), and attended a Dale Carnegie course at the suggestion of Manheim. Gorey Depo. at 18:2-16 (Gaither Decl. Ex. B).

C.      **OSR Job Duties.**

51.     The "primary responsibility" of an OSR is to visit car dealers, wholesalers, banks, and fleet lease accounts to present information about the auction with the "goal" of getting them to visit the auction to purchase and sale vehicles.  Gorey Depo. at 81:16-82:16, 86:15-86:20, 88:21-89:2, 89:23-90:2 (Gaither Decl. Ex. B) (she "got dealers to consign cars to the auction that hadn't previously consigned cars to the auction" and visited dealers "to get them to do more business at the auction"); Gorey Decl. (Dkt. 24) at ¶¶ 11, 24; Declaration of Michelle Cummings ("Cummings Decl.") at  ¶ 5 and Ex. B (Opt-In Sabrina Ruffin expressed her own stated goal of visiting 30-45 new dealers per month and having "100 cars consigned in one week"); McKenna Decl. at ¶ 3 ("my main duty has been to travel around and visit motor vehicle dealers at their place of business and to sell the services of Manheim New York and the use of its facilities"); id. at ¶ 5 ("I generally spend four days of the work week making sales calls on dealers.  I try to see 8-10 dealerships per day and 40-50 per week."); (Haeger Decl. at ¶ 5 (goal of visiting "8-15 dealerships a day and "35 dealerships per week on average"); Maddox Decl. at ¶ 7 (goal of visiting "5-7 dealerships per day and 20-30 dealerships per week"); Delano Decl. at ¶ 7 (goal of visiting "7-10 dealerships per day and 20-30 dealerships per week"); Kent Decl. at ¶ 5 ("8-15 dealerships per day, and I would visit over approximately 40-50 dealerships per week on average"); Conditional Cert Order at 3-4.

52.     More specifically, the OSR's goal is to "sell" the auction's various services and use of its facilities to those dealer customers.  Gorey Depo. at 95:17-19 (Gaither Decl. Ex. B) ("I was recommending doing business at Manheim Auto Auction, absolutely, Manheim New York, yes."); Herbst Depo. at 66:8-66:11 (Gaither Decl. Ex. CC) (confirming that, in his position, he

got buyers and sellers to use Manheim's facilities and services); McKenna Decl. at ¶¶ 3, 6-10,

14; ("As an OSR my main duty has been to travel around and visit motor vehicle dealers at their

place of business and to sell the services of Manheim New York and the use of its facilities.");

Maddox Decl. at ¶¶ 4, 6-11, 13 ("As an OSR my main duty was to visit motor vehicle dealers at

their place of business or other convenient locations for them and sell the services and facilities

that [Manheim Atlanta] had to offer."); Haeger Decl. at ¶¶ 3, 4, 6-13 (same); Delano Decl. at ¶¶

3-4, 6-9, 11, 14, 15 (same); Kent Decl. at ¶¶ 3-4, 6-13 (same); Resume of E. Delucia (Gaither

Decl. Ex. II) ("Achievements [at Manheim]: Increased auction base by 35 dealerships, and

signed up several dealerships on Online Vehicle Exchange Program."); Declaration of Buddy

Wilkes ("Wilkes Decl.") at ¶ 5 ("It was always my understanding that [ ] sales representatives

from Manheim were salespersons for the Auction, with the job of selling Manheim services and

the use of the Auction's facilities to dealerships, such as ours….).

    53.    In doing that, OSR's responsibilities include, <u>inter alia</u>:

- "enhance[] the volume of [a]uction sales by developing new business and retaining existing customers"

- "travel throughout the assigned territory to call on and visit regular and prospective customers…"

-  "reward sellers in better lane positions for dealers who sell high percent of cars for volume"

Herbst Depo. at 89:10-15; 90:8-20; 96:14-21 (Gaither Decl. Ex. CC); <u>id.</u> at Ex. 46 (Gaither Decl.

Ex. FF) (full job description); <u>id.</u> at 81:14:-81:23 (discussing ways he would get new dealers to

come to the auction, how he would "entice them to come"; <u>id.</u> at 97:9-97:12 (responsible for

enhancing the volume of auction sales by developing new business and retaining existing

customers); Gorey Depo. at 25:15-27:5, 28:22-29:2 (Gaither Decl. Ex. B); <u>id.</u> at Exs. 3 (Gaither

Decl. Ex. E) (resumes) & 9 (Gaither Decl. Ex. H) (full signed job description); Pendley Resume

(Gaither Decl. Ex. KK) (discussing responsibilities as "Outside Dealer Sales Representative" at

"Manheim Cincinnati"); Maddox Decl. at ¶¶ 4, 6-14, 18, 24 ("[M]y primary role as an [OSR]

was not only to maintain existing accounts, but to grow those accounts and to sell the auctions

services and facilities to new dealers as well."  Id. at ¶ 6); Delano Decl. at ¶ 6 (same); Haeger

Decl. at ¶ 3 ("It was my responsibility to grow that existing business and to identify new dealers

that I could sell the services and facilities of Manheim Chicago to."); Kent Decl. at ¶ 4 (" It was

my responsibility to grow existing business in my territory and to identify new dealers to whom I

could sell [Manheim Georgia's] services and the use of its facilities."); <u>see also</u> Conditional Cert

Order at 3; Declaration of Todd Krakower (Dkt. #23) at  ¶ 5 & Ex. C.

      54.    OSRs cover a wide geographic sales territory.  Gorey Decl. (Dkt. 24) ¶ 7; Gorey

Depo. at 78:25-79:9 (Gaither Decl. Ex. B) (territory included "Connecticut and east of the

Hudson River" and other dealerships she "had a good rapport with over the years"); <u>id.</u> at 80:21-

81:15 (Gaither Decl. Ex. B); Gaither Decl. at Ex. BB (Gorey declaring over 32,000 miles for

business travel in one year); Herbst Depo. at 77:24-79:21 (Gaither Decl. Ex. CC); Conditional

Cert Order ("Plaintiff traveled throughout the East Coast to new and used car dealers,

wholesalers, banks, and fleet leasers."); McKenna Decl. at ¶ 5 ("I typically travel approximately

300 miles per week visiting dealers."); Maddox Decl. at ¶ 7 ("typically travelled 400-600 miles

in a given week making sales calls.  I had a very extensive territory and could travel up to 300

miles in a day."); Haeger Decl. at ¶ 5 ("I typically traveled between 16,000-18,000 miles per year

visiting dealers."); Delano Decl. at ¶ 7 ("typically travelled 400-500 miles in a given week

making sales calls"); Kent Decl. at ¶ 5 ("typically traveled between 20,000-25,000 miles per year

visiting dealers"); see also Gorey Depo. at 108:20-109:2 (Gaither Decl. Ex B) (confirming she sometimes worked with dealers "outside of [her] territory [that] chose to work just with [her]").

55.    Given the nature of their jobs, OSRs are not directly supervised, and it is up to OSRs to determine how best to visit dealers and manage their work day.  They set their own hours, and there is no realistic way to monitor their hours.  Charlesworth Depo. at 128:15-129:8; 162:2-13; 191:12-8 (Gaither Decl. Ex. OO); McKenna Decl. at ¶ 20 ("Given that I am usually away from [Manheim New York] traveling to customers, alone in most cases, I have no direct supervision by [Manheim New York's] management on most days."); id. at ¶ 21 (discussing work schedule: "I set my own agenda and boundaries in handling those items, and it would be exceedingly difficult to track my hours worked in any traditional way."); Haeger Decl. at ¶ 21 (discussing difficultly in "track[ing] hours in any traditional way"); Maddox Decl. at ¶¶ 23, 24 ("I set my own daily agenda to maximize my dealer visits and sales and ultimately my commissions.  Given that I was usually away from [Manheim Atlanta] traveling to customers, alone in most cases, I had no direct supervision by [Manheim Atlanta's] management on most days … I set my own agenda, so it would be exceedingly difficult to track my hours worked as an OSR in any traditional way."); Delano Decl. at ¶¶ 24, 25 ("set my own daily agenda to maximize my dealer visits and sales and ultimately my commissions … My schedule was very flexible, it was up to me to determine how best to manage my work day and my free time."); Kent Decl. at ¶¶ 19-20 (discussing flexibility of schedule); cf. Gorey Depo. at 177:16-17 (Gaither Decl. Ex. B) (testifying that she worked "80-90 hours a week").

56.    OSRs are, however, expected to travel and call on dealers with most of their work time.  Herbst Depo. at 100:19-100:21(Gaither Decl. Ex. CC) (spent 80-90% of his time traveling to visit dealers); id. at 109:20-109:21 (Gaither Decl. Ex. CC) (travelled between 500 and 700

miles in an average week); Herbst's Responses to Defendant's First Set of Interrogatories

(Gaither Decl. Ex. GG) ¶¶ 2, 9 (spent 80% of time working off-site: "worked on average 100

hours per week … about 20 hours per week at the actual auction site"); Cummings Decl. at ¶ 4

and Ex. A (Opt-In Sabrina Ruffin flew in from her home state on auction days only and averaged

8250 reimbursed miles per month during one stretch, 4062 during another, and approximately

5241 in March 2009, with her own stated goal of visiting 30-45 new dealers per month); Ruffin's

Responses to Defendant's First Set of Interrogatories (Gaither Decl. Ex. HH) ¶¶ 2, 9 (spent

approximately 80% of time working off-site: "worked on average 65-70 hours per week … about

12-16 hours per week at the actual auction site."); Pendley's Responses to Defendant's First Set

of Interrogatories (Gaither Decl. Ex. JJ) ¶¶ 2, 9 (spent approximately 80% of time working off-

site: "worked on average 50-55 hours per week … about 10 hours per week at the actual auction

site."); Hendrix's Responses to Defendant's First Set of Interrogatories (Gaither Decl. Ex. MM)

¶¶ 2, 9 (spent approximately 80% of time working off-site: "worked on average 55-65 hours per

week … about 10-15 hours per week at the actual auction site."); McKenna Decl. at ¶ 5 ("80% of

my work time" spent away from Manheim New York); Maddox Decl. at ¶ 21 ("I spent the great

majority of my time away from [Manheim Atlanta] , at least 80% of the work week."); Haeger

Decl. at ¶ 5 ("[T]he majority of my week was spent away from [Manheim Chicago and Manheim

Metro Chicago] making sales calls on dealers."); Delano Decl. at ¶ 7 ("spent a substantial part of

the working week away from [Manheim Chicago and Manheim Metro Chicago] making sales

calls on dealers."); Kent Decl. at ¶ 5 ("[A]t least 80% of my work week was spent away from

[Manheim Georgia] making sales calls on dealers."); (Gorey Decl. (Dkt. 24) at ¶¶ 11, 24

("primary responsibility" was to "visit dealers and businesses"); Gorey Depo. at Ex. 9 (Gaither

Decl. Ex. H) ("Roughly 80% of your time will be travel; weekends might be required as business

dictates."); id. at 173:24-174:8 (Gaither Decl. Ex. B) ("could be" on the road two or three days per week); see also Gorey Decl. (Dkt. 24) ¶ 13 (would "oftentimes have to wait a long period of time" for a dealer on a visit); Conditional Cert Order at 3 (summarizing visitation and travel duties of position).

57.     OSRs are provided company cars, laptop computers, and mobile phones with mobile service to facilitate their visits to dealers and their work away from the auction premises. Herbst Depo. at 101:7-101:8 (Gaither Decl. Ex. B) (mobile phone); id. at 109:4-101:5 (Gaither Decl. Ex. B) (company car); id. at 108:5-108:6 (Gaither Decl. Ex. B) (laptop); Gorey Depo. at 273:5-7 (Gaither Decl. Ex. B); Charlesworth Decl. at ¶ 12; McKenna Decl. at ¶ 5 (Manheim New York "provides me a cell phone, company car, and a laptop computer so that I can work from the road."); Haeger Decl. at ¶ 5; Maddox Decl. at ¶ 7 (Manheim Atlanta "provided me with a cell phone and a laptop computer with mobile internet access so that I had all of the tools necessary to sell while I was on the road."); Delano Decl. at ¶ 7 (same); Kent Decl. at ¶ 5.

58.     OSRs often eat lunch or dinner and attend other entertainment events with dealers away from the auction and develop at "good rapport" with them.  Gorey Depo. at 77:13-77:19, 79:4-79:6 (Gaither Decl. Ex. B) (including "dinners, cruises, baseball games, basketball games, one football game, bus trips down to Carmine's in Atlantic City, Renegades games, dinners"); Gorey Decl. (Dkt. 24) ¶ 20; Herbst Depo. at 112:20-112:21 (Gaither Decl. Ex. CC) (lunches and golfing trips); id. at 112:22-113 (Gaither Decl. Ex. CC).

59.     OSRs would also attend trade shows to "display or demonstrate auction sales and services…and emphasize salable features."  Gorey Depo. at 91:25-92:5 (Gaither Decl. Ex. B).

60.     OSRs also prepared business plans setting out sales goals.  Business Plan of Opt-in Plaintiff Nick Bothwell (Gaither Decl. at Ex. NN) (stating among other things his goal of "9-

15% increase in total unit sales," and "[b]uild franchise accounts that bring in large volume of vehicles through both frontline and trades without forgetting about the independent dealers"); Pendley Personal Goals/Territory Goals & Seminars (Gaither Decl. Ex. LL) ¶ 2 ("In order to obtain my goals I feel I need to get in front of dealers with figures I can offer them to entice them to start, continue, and increase units with [Manheim Cincinnati].").

61.     OSRs also negotiate with dealers special auction fee arrangements with the goal of getting the dealers to use the auction's facilities to consign and sell more cars and to purchase more services, which would increase their commissions.  Charlesworth Depo. at 94:6-8 (Gaither Decl. Ex. OO) (OSRs are "free to negotiate that [fee schedule] with the customer face-to face"); Gorey Depo. at 128:23-130:5 (Gaither Decl. Ex. B)  (Plaintiff "may have" told the Court at 11/16/10 status conference that she "completed the sale for [her] deals"); id. at 131:17-132:6 (Gaither Decl. Ex. B) (Gorey could accept consignments on standard fee schedule and take dealer requests for special fee arrangements); id. at 135:8-136:13 (Gaither Decl. Ex. B) (Gorey prepared and documented dealer "A/R exception" fee schedules for management approval and could not recall specific examples of management declining to approve such schedules); id. at Ex. 13 (Gaither Decl. Ex. I) (examples of numerous A/R Exception Lists with Gorey listed as "contact"); id. at 147:23-25 (Gaither Decl. Ex B) (involved in "initial drafts" of fee deals); id. at Exs. 16-18 (Gaither Decl. Exs. J-L) (emailing dealer fee schedules to herself and others); Herbst Depo. at 114:6-25; McKenna Decl. at ¶ 8 ("I can and do negotiate with dealer prospects on those fees … I know generally what auction management is looking for – principally, volume and sales percentage – and I will typically discuss that with the dealer as part of the initial negotiation and try to get the dealer into a range on each fee category that I expect will be acceptable to management."); id. at ¶ 9 ("one type of concession I often negotiate with dealers is a waiver of

the standard 'no sale' fee charged to dealers who run a vehicle through the auction that does not sell."); <u>id.</u> at ¶ 10 ("Once I have come to terms with the dealer on a fee schedule, it is generally memorialized in an 'A/R Exception List' or some equivalent document."); Haeger Decl. at ¶¶ 8-9, 11 (negotiates rebates and concession and waived buy back fees: "I exercised my business judgment to give dealers credit and waive certain fees where I thought the waiver of fees might lead to further business … [or] encourage the dealer to continue using the Auction's services and facilities." <u>Id.</u> at ¶ 11); Maddox Decl. at ¶ 9; Delano Decl. at ¶¶ 9-10; Kent Decl. at ¶¶ 8-9; <u>see also</u> Facts 22-25 <u>supra</u>.

62.     Occasionally, the agreement will be signed by the dealer while with the OSR is at the dealership.  Charlesworth Depo. at 97:2-9, 107:15-108:1(Gaither Decl. Ex. OO); Haeger Decl. at ¶ 9; Delano Decl. at ¶ 10 (" Once I came to terms with the dealer on a fee schedule, it was generally memorialized in a document.") Kent Decl. at ¶¶ 8-9; <u>cf.</u> Gorey Depo. at 142:15-144:5 (Gaither Decl. Ex B); <u>id.</u> at Ex. 16 (Gaither Decl. Ex. J (documenting a fee deal with a dealer, a copy of which may have been shared with the dealer).

63.     The dealer makes a "commitment" to the OSR to consign vehicles to the action. Gorey Depo. at 89:3-13 ("Gaither Decl. Ex. B).  An OSR may also be given a "pick-up notice" on the spot while at the dealership, and be asked to immediately call transport to pick up cars from the dealer.  Charlesworth Depo. at 114:17-23 (Gaither Decl. Ex. OO); Gorey Depo. at 113:6-14 (Gaither Decl. Ex. B) (If a dealer immediately "agreed" to use the auction's services, Gorey would "just get on the phone and call the auction" to get them "numbers.")

64.     If not, the OSR would typically follow-up a visit with an interested dealer, in person and/or by phone, until the OSR obtains a consignment of vehicles.  Charlesworth Decl. at ¶13; McKenna Decl. at ¶ 12 ("I follow-up with the dealer to solicit and arrange specific

consignments and assist in shepherding those vehicles through the auction process with the goal of getting them actually sold, for which I earn a commission."); Haeger Decl. at ¶ 13 (answering calls from dealers to get "their cars consigned and sold at [Manheim Chicago and Manheim Metro Chicago and getting them to send and sell more units."); id. at ¶ 12 ("followed up with the dealer to solicit and arrange specific consignments and assisted in shepherding those vehicles through the auction process with the goal of getting them actually sold, for which I earned a commission"). Delano Decl. at ¶¶ 11, 14 (same) ; Maddox Decl. at ¶ 13 (same); id. at ¶ 10 (arranged for dealers' vehicles to get transported to Manheim Atlanta for sale day); Kent Decl. at ¶¶ 12-13; Herbst Depo. at 70:8-70:13 (Gaither Decl. Ex. CC) (would schedule transportation for dealers' vehicles); Gorey Depo. at 102:19-106:4 (Gaither Decl. Ex. B) (assisted dealers in her territory with transport and getting cars set for sale, as was "typical"); id. at 113:22-114:20 (Gaither Decl. Ex. B) (testifying that she would "be[] in contact with [the dealers] nonstop through the whole process" until the dealers would "call their transporter" or have the auction "pick up their cars for them").

65.     OSRs would typically spend only the auction's weekly sale day at the auction assisting dealers in getting cars set up for auction.  Herbst Depo. at 76:14-77:8 (Gaither Decl. Ex. CC); McKenna Decl. at ¶ 17; Maddox Decl. at ¶ 18; Kent Decl. at ¶ 17.  Although they might pitch in and perform other duties, most of their work at the auction's facilities is administrative and incidental to completing the sales for their dealers.  Gorey Depo. at 14:4-14:7, 69:2-69:10 (Gaither Decl. Ex. B) (would represent cars on the auction block for dealers); id. at 131:6-131:11 (Gaither Decl. Ex. B) (would advocate for favorable [lane] and run numbers for dealer customers); Herbst Depo. at 66:15-66:6 (Gaither Decl. Ex. CC) (would fax run lists to dealers, check that there were no problems with the vehicles, making sure the vehicles were in the correct

sale); id. at 45:23-46:5, 67:14-67:15 (Gaither Decl. Ex. CC) (would assign his dealers lane

numbers); id. at 67:16-67:24 (Gaither Decl. Ex. CC)  (discussing the importance of the run

numbers: "It gives [the dealer] a better opportunity to sell …[t]he closer they are to the beginning

of the auction, they feel that -- well, it's where the most money is. More people are buying at the

beginning than towards the end."); id. at 69:18-69:20 (Gaither Decl. Ex. CC) (would advocate

for favorable [lane] numbers for dealer customers); Charlesworth Decl. at ¶ 13; Soudek Decl. at

¶ 8; McKenna Decl. at ¶ 13 (discussing dealer requests for lane numbers: "I will take such

requests from my dealers and advocate favorable 'numbers' for them with [Manheim New

York], both to encourage those and future consignments from those dealers and increase the

likelihood and number of units they sale, which increases my commission."); id. at ¶ 17 (job

responsibilities on sale day "are directly related to finalizing the sale of the unit and earning

myself a commission, which also keeps my dealer happy and makes it more likely he/she will

consign and sell more cars, leading to further commissions for me."); Haeger Decl. at ¶ 12, 18

("Where possible, I advocated to those assigning numbers that my dealers got the run numbers

they preferred, both to increase the likelihood and number of units the dealer sold and to

encourage future consignments from that dealer, which would increase my commissions."  Id., at

¶ 12); Maddox Decl. at ¶ 11 ("Where possible, I would advocate with [Manheim new York's]

sale coordinators to get favorable 'numbers' for my dealers, both to keep my dealers happy and

to increase the chances of my dealer's vehicles being sold, which increased my commissions.");

id. at ¶ 18 (discussing activities undertaken on sale day: "all of these activities were directly

related to finalizing the sale of the unit and earning myself a commission"); Delano Decl. at ¶ 12,

19, 20; Kent Decl. at ¶¶ 12, 17 ("If there were more favorable spots in the lanes still available,

then I would try and get my dealers' vehicles moved into those positions."); Wilkes Decl. at ¶ 2

("I worked with [my OSR] in getting run numbers, setting up cars for auction, and any other issues incidental to the auction process.").

66.     For example, on sale day, an OSR's duties might include: assisting their dealers with transport, getting their cars ready for sale, representing their cars on the auction block, assisting them with any paperwork to complete the sale, helping them resolve any issues or concerns with the sale, and advocating for them in any post-sale arbitration discussions.  OSRs also sometimes help negotiate "if sales" or "conditionals" where the highest bid did not quite reach the seller's reserve price to see if they can help the customer close the deal.  Gorey Depo. at 129:24-25 (Gaither Decl. Ex. B) (she is "there with the invoice for [the dealers] to sign on sale day"); Charlesworth Decl. at ¶ 13; Herbst Depo. at 49:22-50:11 (Gaither Decl. Ex. CC) ("the buyer can step up and pay more, or the seller can drop it. I'm the middleman between those two making their decisions."); id. at 52:5-52:8 (Gaither Decl. Ex. CC) (confirming that he earned a commission if the transaction closed); id. at 52:12-52:14 (Gaither Decl. Ex. CC) (confirming there was a financial incentive for him to have the transaction close); McKenna Decl. at ¶¶ 13, 17; Maddox Decl. at ¶ 18 ("At every sale I negotiated 'if sales' where the highest bid did not quite reach the seller's reserve price to see if I could help my customer close the deal."); Haeger Decl. at ¶ 18 (discussing finalizing "if sales" to "keep dealer happy making it more likely that they would consign and sell more cars, leading to further commissions"); Delano Decl. at ¶¶ 19, 20 ("I had a vested interest in keeping a deal between a buyer and a seller together.  If a deal closed, then I could earn a commission on that deal.  I wanted my dealers to sell and/or buy as many vehicles as possible at the sale for the best possible prices, so they would transact more in the future." Id. at ¶ 20); Kent Decl. at ¶ 17.

67.     OSRs would engage in the duties, often without substantial input or supervision. McKenna Decl. at ¶ 17 (discussing sale day activities "I exercise my judgment in making decisions for my dealers and [Manheim New York] with respect to these issues, and all of these activities are directly related to finalizing the sale of the unit and earning myself a commission."); Maddox Decl. at ¶ 6 ("It was left up to me to determined how to contact dealers and how best to sell the [Manheim Atlanta's] services and facilities to them."); Delano Decl. at ¶ 4 ("I determined how to contact dealers and how best to sell the [Manheim Chicago and Manheim Metro Chicago's] services and facilities to them.").

68.     OSRs also generate substantial revenue for their employer through their duties. McKenna Decl. at ¶ 18 ("Most of my dealers buy and sell multiple cars in a given trip to the Auction, and most of those cars are worth several thousand to tens of thousands of dollars each. So each auction sale is significant in dollar amount, and keeping it together is important to the dealer, [Manheim New York], and to me, in terms of commissions and getting further volume from that dealer."); Haeger Decl. at ¶ 16 ("Although impossible for me to calculate with certainty, the dealers in my territory on average generated well over $1.4 million per year in fee revenue for the Auction based on the number of units consigned and sold and average fees per unit at the time."); Maddox Decl. at ¶ 20 ("Although impossible for me to calculate with certainty, I estimate the dealers I sold to generated well over $100,000 per year in fee revenue for [Manheim Atlanta] based on the number of units consigned and sold and average fees per unit at the time.").

69.     OSRs are also involved in handling dealer complaints regarding agreed upon fees. Gorey Depo. at 118:2-22 (Gaither Decl. Ex B) (when a dealer questioned a fee change, Gorey would intercede with management to remind them "what was agreed upon," which was

documented at the auction); McKenna Decl. at ¶ 10 ("I routinely do answer to dealers and help

get it sorted out if they are charged more than the agreed upon fees."); Maddox Decl. at ¶ 13 ("I

would also answer calls from dealers about their cars, about their fees, and any number of other

issues incidental to getting their cars consigned and sold at the Auction and getting them to send

and sell more units."); Haeger Decl. at ¶ 9 ("[T]he dealer would contact me if there were any

questions with regards to the rebates, if they were actually charged differently than discussed, or

if they wanted to renegotiate the rebate plan."); Delano Decl. at ¶ 10 ("If a dealer was charged

more than the agreed upon fees or the dealer wanted to re-negotiate the fees, they would come to

me to discuss.  I was the first point of contact for the dealer because I negotiated the fees directly

with the dealer."); Kent Decl. at ¶ 9 ("Dealers would contact me if there were any questions with

regards to fees, if they were actually charged differently than discussed, or if they wanted to

renegotiate the fee structure.").

70.     Even when a OSR is involved in handling dealer complaints and other issues at

the auction not strictly tied to a sale by one of their own dealers, those issues are still important

to the auction's customers and the auction's business and usually tens of thousands of dollars in

property are at issue.  Charlesworth Decl. at ¶ 14; McKenna Decl. at ¶ 18 ("Most of my dealers

buy and sell multiple cars in a given trip to [Manheim New York], and most of those cars are

worth several thousand to tens of thousands of dollars each.  So each auction sale is significant in

dollar amount, and keeping it together is important to the dealer, [Manheim New York], and to

me . . . ."); Haeger Decl. at ¶ 15 ("Dealers were typically very serious about having their cars

handled properly and getting the best possible prices for them, as was the Auction."); Kent Decl.

at ¶ 15 (same); Delano Decl. at ¶ 21 ("majority of my dealers bought and sold multiple cars in a

given trip … most of those cars were worth thousands of dollars each.  So each auction

transaction was significant in dollar amount, and keeping the sale together was important to the dealer, the Auction, and to me . . . ."); Maddox Decl. at ¶ 19 (same).

71.     Manheim New York expects its OSRs to increase the sales percentage at the auction of their dealers, and sales success is the primary focus in an OSR's performance evaluations.  OSRs who fail to perform have been terminated or have quit due to failure to make substantial commissions.  Charlesworth Decl. at ¶ 15; McKenna Decl. at ¶ 16 ("My sales success is the primary focus in my periodic performance evaluations [.]"); Maddox Decl. at ¶ 17 ("My sales success was the primary focus in my periodic performance evaluations from [Manheim Atlanta's] management."); Haeger Decl. at ¶ 17 (same at Manheim Chicago/ Manheim Metro Chicago); Delano Decl. at ¶ 18 (same); Kent Decl. at ¶ 16 (same at Manheim Georgia).

DATED this 4th day of April 2011.

Respectfully submitted,

BOND, SCHOENECK & KING PLLC

/s/John Ho
By:     John Ho
Amy M. Culver
330 Madison Avenue
39th Floor
New York, New York 10017
Tel:   (646) 253-2300
Fax:   (646) 253-2364
E-mail: hoj@bsk.com
        culvera@bsk.com

Jason S. McCarter
Russell A. Jones
Lesli N. Gaither
DOW LOHNES PLLC
Six Concourse Parkway, Suite 1800
Atlanta, Georgia 30328
Tel:   (770) 901-8800
Fax:   (770) 901-8874

E-mail:
        jmccarter@dowlohnes.com
        rjones@dowlohnes.com
        lgaither@dowlohnes.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 4th day of April 2011, I caused a copy of the foregoing

DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF

THEIR MOTION FOR SUMMARY JUDGMENT to be served via the Court's ecf system upon

counsel for plaintiff Todd Krakower, Esq., Glass Krakower LLP, 20 Broadway, Suite 1,

Vallhalla, NY 10595,  Michael R. DiChiara, Esq., DiChiara Law Firm LLC, 77 Market Street,

Suite 2, Park Ridge, NJ 07656 , and Liane L. Katzenstein, Kingsley & Kingsley, APC, 16133

Ventura Blvd., Suite 1200, Encino, CA 91436.


/s/ <u>John Ho</u>
John Ho

34